UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 17-51-2-DLB-CJS

UNITED STATES OF AMERICA                                                                 PLAINTIFF

vs.                              **MEMORANDUM OPINION AND ORDER**

CORNELIUS FABIAN EDRINGTON                                                         DEFENDANT

* * * * * * * * * * * * * * * * * *

This matter is currently before the Court upon Defendant Edrington's Motion to Suppress Statements to Law Enforcement Officers on May 31, 2018 (Doc. # 65). The Court conducted an evidentiary hearing on February 13, 2019. (Doc. # 78). Defendant was present for the hearing and was represented by Attorney David Dudley. The Government was represented by Assistant United States Attorney Anthony Bracke. At the conclusion of the hearing, the Court took the motion under submission. For the reasons set forth herein, and because the Court concludes Defendant was not subjected to a custodial interrogation on May 31, 2018, Defendant's Motion to Suppress is **denied**.

I.   **FINDINGS OF FACT**

During the February 13, 2019 evidentiary hearing held, the Court heard testimony from three witnesses. The Government called DEA Task Force Agent (TFA) Ken Baker and U.S. Probation Officer Jennifer Huber (Doc. # 79). Defendant testified on his own behalf (*id.*). Weighing the credibility of the witnesses, the Court makes the following factual findings:

1. During 2018, Defendant was on federal supervised release from a felony drug conviction he had obtained in the Southern District of Ohio. U.S. Probation Officer (USPO) Jennifer Huber was his supervision officer with U.S. Probation in Cincinnati, Ohio and had been so for several years. As a condition of his supervised release, Defendant was required to report as directed by USPO Huber and to truthfully answer all inquiries by the probation officer.

2. Prior to May 31, 2018, Defendant had regularly reported to USPO Huber's office as directed by her. On those prior occasions, USPO Huber would either meet him in the lobby or in an interior conference room inside the probation office. Defendant would occasionally have his infant son with him when he reported to USPO Huber's office.

3. Because Defendant had been identified as a participant in a conspiracy to distribute marijuana, and information obtained by law enforcement suggested that he may have relevant information relating to the distribution of heroin and fentanyl in the Cincinnati area, TFA Baker asked USPO Huber to have Defendant report to the probation office for a meeting. TFA Baker was hoping to speak to Defendant to see if he would be willing to cooperate regarding opioid distribution. Because meeting with Defendant in Avondale was impossible without possible suspects of the opioid investigation noticing the presence of law enforcement, TFA Baker asked USPO Huber to have him come into her office for the meeting.

4. On May 30, 2018, USPO Huber sent Defendant a text message to see if he could report to turn in monthly supervision reports that she was missing. Because their regular method of communication was via text message, receiving a text message to report the following day was not unusual and raised no red flags whatsoever. However,

2

USPO Huber did not tell Defendant that TFA Baker would be present to speak with him on May 31, 2018.

5. On May 31, 2018, Defendant reported to USPO Huber's office as directed. As was the case on previous occasions, Defendant had his infant son with him. Upon his arrival, USPO Huber directed him to an interior conference room. Defendant entered the room and picked his own seat, the one closest to the door.

6. Shortly after Defendant sat down, TFA Baker and Drug Enforcement Administration ("DEA") Special Agent ("SA") Jeff McKinley entered the room. USPO Huber also entered the room but did not speak during the meeting. Both officers were in plain clothes and sat down with the Defendant. No one blocked Defendant's access to the door and no weapons or handcuffs were displayed by either officer. Defendant was not restrained in any way during the brief meeting and held his infant son during the entire interview.

7. At the inception of the meeting, TFA Baker introduced himself and SA McKinley and specifically told Defendant he was not under arrest and was free to go.[1] TFA Baker asked him if he was willing to speak to them and Defendant agreed. However, TFA Baker did not tell him he did not have to participate in the interview. TFA Baker told Defendant that his name had come up in an ongoing opioid investigation and that they wanted to speak to him about possibly obtaining his cooperation in that investigation. TFA Baker

---

[1] Although Defendant testified that he was never told he was not under arrest and free to go, USPO Huber corroborated TFA Baker's version of events. Because Defendant has a motive to lie, to wit, gain suppression of his statements by suggesting that he was not so advised, the Court credits TFA Baker and USPO Huber's collective testimony that Defendant was told he was free to go and was not under arrest prior to any statements he gave to them.

also explained that they arranged to speak to him at the probation officer to preserve his privacy since the agents were concerned that approaching him at his Avondale residence would have tipped off neighbors and associates. TFA Baker asked if he was willing to hear them out and Defendant agreed.

8. After Defendant agreed to listen to their proposal, the officers discussed how the marijuana conspiracy led them to the Defendant. Defendant briefly discussed his involvement in that offense. At the conclusion of the interview, TFA Baker asked Defendant to consider cooperating, gave him his card, and requested that he let them know by June 4, 2018 one way or the other. Defendant agreed to do so and exited the probation office with his son.

9. The entire meeting at the probation office lasted approximately fifteen (15) to twenty (20) minutes. No one told the Defendant that he was going to be indicted in connection with the marijuana case or threatened him in any way during the May 31 meeting.[2] Nor was he restrained or blocked from leaving during the meeting, and no one made any threats or engaged in any coercive tactics with the Defendant during the brief meeting.

## II. ANALYSIS

**Because Defendant was not in custody while at the U.S. Probation Office on May 31, 2018, *Miranda* warnings were not required, and any statements made by him on that date will not be suppressed.**

---

[2] According to Edrington, the officers told him he would be indicted in the marijuana case if he failed to cooperate in the opioid investigation. The Court concludes that did not occur. In making this finding, the Court credits the testimony of TFA Baker and USPO Huber

It is well-settled that a suspect under custodial interrogation must be given notice of his Fifth Amendment right against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To ensure compliance with this rule, incriminating statements elicited during custodial interrogation prior to *Miranda* warnings cannot be admitted at trial. *Stansbury v. California,* 511 U.S. 318, 322 (1994). However, this rule only applies "where there has been such a restriction on a person's freedom as to render him 'in custody.' " *Oregon v. Mathiason,* 429 U.S. 492, 495 (1977). The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444. "[T]he proper inquiry ... [involves] two essential questions: '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *Coomer v. Yukins,* 533 F.3d 477, 485 (6th Cir. 2008) (quoting *Thompson v. Keohane,* 516 U.S. 99, 112 (1995)).

In determining whether there is a custodial interrogation, courts apply an objective rather than a subjective standard. That is, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984). The "ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125 (1983).

The Sixth Circuit has identified several factors courts should consider in determining whether a defendant was subject to a custodial interrogation, First, whether a reasonable person in defendant's situation "would have believed that [he] was free to

5

terminate the interrogation and leave." *United States v. Crossley,* 224 F.3d 847, 861 (6th Cir. 2000). Second, the location of the interview; third, the length and manner of the questioning; fourth, whether there was any restraint on the individual's freedom of movement; and lastly, whether the individual was told that he did not need to answer the questions. *United States v. Hinojosa,* 606 F.3d 875, 883 (6th Cir. 2010). Applying this reasonable man standard to the facts of this case leads the Court to conclude that Defendant was not in custody on May 31, 2018.

First, nothing about the 15-20 minute interview bore the indicia of the restriction of freedom of movement to the degree associated with a formal arrest. In fact, it was nothing of the kind. Although Defendant was asked to report to the probation office by his probation officer, when greeted by agents he was immediately told that he was not under arrest and was free to leave at any time. His testimony that he felt compelled to answer their questions because his supervised release conditions required him to truthfully answer any inquiries by his probation officer does not move the needle towards custody in the Court's view. After all, it is an objective, not subjective inquiry. USPO Huber, while present, did not ask a single question throughout the entirety of the interview.

To ensure the Defendant's neighbors did not see him speaking to law enforcement, the agents chose to speak to him at the probation office instead of at his residence in Avondale. They also were primarily asking him about cooperating in an opioid investigation and the interview was designed to gain his cooperation in that investigation. The interview was brief, and Defendant exited the office with his infant son immediately upon its conclusion. No weapons were displayed and the questioning was neither coercive or threatening. None of the hallmarks of a formal arrest were present. Put

simply, there was nothing about the interview that would lead a reasonable person to believe they were under arrest during the interview.

In fact, the only *Hinojosa* factor which is arguably neutral and may slightly favor Defendant's argument is whether he was told he was under no obligation to participate and answer the agent's questions. Although neither TFA Baker nor SA McKinley specifically told him he did not need to participate, the tone and tenor of the brief interview was consensual, as they were seeking to gain his cooperation in an unrelated opioid investigation, rather than ask him about the marijuana conspiracy case. The fact that SA McKinley did ask a few questions about the marijuana case does not turn a non-custodial situation into a custodial one.

This case is similar to the Sixth Circuit's decision in *United States v. Panak*, 552 F.3d 462, 467 (6th Cir. 2009) where the Court found that the Defendant was not in custody during a 45 minute interview. The fact that Defendant was never specifically told he didn't need to submit the questioning is not dispositive, but merely one of several factors. The case of *United States v. Nieblas*, 115 F.3d 703, 705 (9th Cir. 1997) is also persuasive.

In *Neiblas*, the defendant was called into his probation office by his probation officer just like here. Also, he was not told by his probation officer that FBI agents would be present to speak with him. Neiblas arrived at the designated time and was immediately confronted by FBI agents who told him they were interested in speaking with him and that he was not under arrest. Under these facts, the Ninth Circuit found that *Miranda* warnings were not required at Neiblas' appearance at his probation office because he was free to leave and his appearance was not a custodial interrogation triggering *Miranda* rights. *Id*. at 705. Defendant's reliance on *United States v. Barnes*, 713 F.3d 1200 (9th Cir. 2013)

is misplaced as the Defendant in *Barnes* did not appear voluntarily at his parole officer's office. Rather he was told to appear for a meeting with his parole officer under a threat of revocation, a significant distinguishing factor from the facts here.

Because a reasonable person in Defendant's position would not have believed he was in custody on May 31, 2018, the Court concludes that *Miranda* warnings were not required. As a result, the failure of the agents to give Miranda warnings before questioning him does not require suppression of his statements.

### III. CONCLUSION

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1) Defendant Edrington's Motion to Suppress (Doc. # 65) be, and is hereby **DENIED**;

(2) This matter is set for a **Status Conference** on **Tuesday, April 2, 2019 at 11:00 a.m. in Covington. Both defendants and all counsel shall be present for the conference.**

This 21st day of March, 2019.

Signed By:
*David L. Bunning* DB
United States District Judge